[No. D041872. Fourth Dist., Div. One. June 28, 2004.]

ANNETTE F., Plaintiff and Respondent, v.
SHARON S., Defendant and Appellant

1148

1152

**COUNSEL**

Gray Cary Ware & Freidenrich and Guylyn R. Cummins for Defendant and Appellant.

Shopoff & Cavallo, Jeffrey W. Shopoff and Kathleen A. McKinley for Plaintiff and Respondent.

**OPINION**

**AARON, J.**—This case is a spin-off of the highly publicized and controversial litigation over the validity of "second-parent" adoptions[1] in *Sharon S. v. Superior Court* (2003) 31 Cal.4th 417 [2 Cal.Rptr.3d 699, 73 P.3d 554]. In this matter, Sharon S. (Sharon) appeals from an order denying her special motion to strike a libel complaint filed against her by her former partner in a lesbian relationship, Annette F. (Annette). We conclude that Annette's

---

[1] " 'The phrase "second-parent adoption" refers to an independent adoption whereby a child born to [or legally adopted by] one partner is adopted by his or her non-biological or non-legal second parent, with the consent of the legal parent, and without changing the latter's rights and responsibilities.' [Citation.] As a result of the adoption, the child has two legal parents who have equal legal status in terms of their relationship with the child." (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 422, fn. 2 [2 Cal.Rptr.3d 699, 73 P.3d 554].)

complaint arises from protected speech activity by Sharon within the scope of the anti-SLAPP statute, and that Annette has failed to establish a probability of prevailing on her libel claim against Sharon. (Code Civ. Proc.,[2] § 425.16, subds. (b)(1), (e).) Accordingly, we reverse the order denying Sharon's special motion to strike the complaint and remand with directions to grant the motion and enter judgment in Sharon's favor.

I

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Relationship Between Sharon and Annette*

Sharon and Annette met at Harvard Business School and began dating in 1989. They were in a committed relationship from 1989 through mid-2000. After graduating from business school, they moved to San Diego in 1990. Their relationship was volatile, and each ultimately accused the other of engaging in physical and verbal abuse.

In 1992, Sharon and Annette held a public commitment ceremony. They both wore bridal gowns during the ceremony. Their commitment ceremony was covered by the local television news, the San Diego Union Tribune, and the Los Angeles Times.

Sharon and Annette sent an announcement of their ceremony to the local Jewish press. The San Diego Jewish Press published an article about the ceremony. Many angry letters were sent to the newspaper in response to the article. The ensuing controversy led to further coverage in the mainstream media.

Sharon and Annette set up a Web site on which they posted information about their commitment ceremony and accompanying photographs. Their Web site included a discussion of the press coverage, and also included information about gay couples raising children and information regarding second-parent adoptions.

In 1995, Sharon and Annette published a book entitled *Straight Jobs Gay Lives: Gay and Lesbian Professionals, The Harvard Business School, and the American Workplace*. The book was based on interviews with 100 gay and lesbian alumnae of Harvard Business School. Annette was quoted in several discussions of the book that appeared on the Internet.

---

[2] Unless otherwise specified, all statutory references are to the Code of Civil Procedure.

In October 1996, after being artificially inseminated with sperm from an anonymous donor, Sharon gave birth to a son, Zachary. Annette successfully petitioned the court to adopt Zachary as a second parent.

Shortly after Zachary's birth, Sharon and Annette appeared on ABC's Turning Point with Diane Sawyer, as one of four featured couples in a nationally broadcast show on gay and lesbian marriage. Annette's parents were also interviewed on the program. In an announcement about the show sent to friends and family, Annette explained:

"Our motive is to put forth a positive image of a stable and loving lesbian relationship. . . . Through this TV show, we also hope to help other gay people who could benefit from seeing positive role models. We also hope that this program will enlighten hateful people in our society who [attack] gay people as a group and fail to see that we are individuals with aspirations of building loving relationships and who want to share their love by bringing another being into this world."

The Turning Point show featured footage of the commitment ceremony, and a discussion of Zachary's birth and Annette's adoption of Zachary. The program was covered in the national news media, including the New York Times, USA Today, and other newspapers.

In June 1999, after being artificially inseminated again, Sharon gave birth to another son, Joshua. Sharon and Annette signed an adoption agreement for Annette to adopt Joshua as a second parent.

In July 2000, Sharon and Annette got into an argument while driving on a freeway in Nebraska. The children were in the backseat at the time. Sharon was verbally taunting Annette, who was driving the car. Annette backhanded Sharon in the mouth. Sharon hit Annette back. Annette later admitted that she had provoked the physical contact by hitting Sharon in the face. Sharon suffered injuries as a result of the incident.

Sharon and Annette separated in August 2000. In September 2000, Sharon and Annette had another argument during an exchange of the children. Annette kicked the door of Sharon's home. According to Sharon, the door hit her in the arm and gave her a bruise. Sharon called the police, who took statements from Sharon and Annette. A child protective services worker subsequently investigated whether Annette or Sharon had subjected the children to emotional abuse by causing them to witness the incident. She concluded that "allegations of emotional abuse" were "substantiated" as to Annette and "inconclusive" as to Sharon.

On September 26, 2000, Sharon obtained a temporary restraining order against Annette, pending a hearing pursuant to the Domestic Violence Prevention Act. (Fam. Code, § 6200 et seq.) On December 5, 2000, the court held an evidentiary hearing on the matter. Sharon and Annette were both present at the hearing. At the hearing, the court made a finding that Annette had perpetrated domestic violence against Sharon. On February 26, 2001, the court issued a written order granting Sharon's request for a three-year restraining order against Annette.[3]

On October 24, 2001, Annette contacted Joshua's attorney, Terence M. Chucas, and made "allegations" that Joshua had developed "self-mutilating" behaviors. She reported that she had observed Joshua hitting himself after being bothered or struck by his older brother, Zachary. Annette stated that she believed Joshua was being bothered or struck on a frequent basis in Sharon's home. Annette told Chucas that one possible explanation for this behavior was that Zachary may not have been adequately supervised in Sharon's home, because Sharon was absent from home for extended periods. Chucas conducted an investigation and concluded that Annette's concerns were unfounded.

### B. *The Sharon S. Litigation*

In October 2000, Annette filed a motion to adopt Joshua as a second parent. She contended that Sharon's consent to the adoption had become irrevocable and that the adoption was in Joshua's best interest. Sharon responded by moving to withdraw her consent to the adoption and requesting dismissal of Annette's adoption petition. Sharon contended that there was no legal basis for such a second-parent adoption, that her consent had been obtained by fraud or duress, and that withdrawal of her consent was in Joshua's best interest. Joshua's counsel also moved to dismiss the adoption petition.

The trial court denied the motions to dismiss the adoption petition. Sharon filed a petition for writ of mandate, joined by counsel for Joshua, challenging the denial of her motion to dismiss. In her petition, Sharon also challenged a separate order compelling discovery of her communications with her therapist and imposing sanctions against her and her attorney. Numerous organizations filed amicus curiae briefs concerning the validity of second-parent adoptions.

---

[3] Sharon has filed a motion for judicial notice of the transcript of a December 2003 hearing and a January 2004 order extending the restraining order against Annette. These documents shed no new light on the relevant orders of 2000–2001 and thus have no relevance to the issues pending in this appeal. Accordingly, we deny the motion for judicial notice.

On October 25, 2001, this court granted Sharon's writ petition and ruled that, with the exception of stepparent adoptions, there was no statutory basis for an adoption in which a consenting parent does not relinquish all parental rights. The court also found that the discovery issue was moot in light of its determination that Annette's adoption petition had to be dismissed. (*Sharon S. v. Superior Court* (Oct. 25, 2001, D037871), review granted Jan. 29, 2002, S102671, revd. (2003) 31 Cal.4th 417 [2 Cal.Rptr.3d 699, 73 P.3d 554] (this court's *Sharon S.* decision).)

This court's *Sharon S.* decision was highly controversial and received widespread coverage in the media and on the Internet. Some of the articles referred to Sharon and Annette as a "prominent" lesbian couple. Many in the gay and lesbian community criticized the opinion and expressed fear that it cast doubt on the validity of thousands of second-parent adoptions. Sharon was widely criticized in the gay and lesbian community for having challenged the validity of second-parent adoptions.

Two days after the opinion was issued, an article in the San Francisco Chronicle quoted Annette as stating, "I don't know if I'm going to see my children ever again." A newly formed nonprofit organization called Second-Parent Adoption Fund began soliciting contributions for Annette to enable her to take her case to the California Supreme Court. On its Web site, the organization characterized the case as a struggle to "protect the legal status of thousands of children who have been adopted by second-parent adoption procedures over the last 15 years in the State of California," and stated that if Annette did not prevail in court, "thousands of children in California could find that their legal relationship with their adoptive parent is vulnerable to attack by another parent, an employer, insurer or state or federal agency." Interested donors were instructed to send checks directly to Annette's mailing address.

On January 29, 2002, the Supreme Court granted Annette's petition for review of this court's *Sharon S.* decision. The San Francisco Chronicle ran another article quoting Annette's description of the case as follows: "It represents my personal struggle to be recognized as my son's parent (and) a fight for our civil rights." Annette was also quoted in a story that was broadcast on National Public Radio.

In August 2003, the California Supreme Court reversed this court's decision. The Supreme Court concluded that a birth parent could consent to a second-parent adoption without relinquishing all parental rights. The court remanded the matter for further proceedings to address Sharon's claim that she had consented to the adoption as a result of fraud, undue influence, and duress. (*Sharon S., supra,* 31 Cal.4th at p. 446.)

In February 2004, this court issued a new opinion on remand. The court noted that both sides had agreed that the issue of whether Sharon's consent to the adoption was obtained by fraud, undue influence, or duress required further evidentiary proceedings in the trial court. With respect to the discovery issue, the court concluded that Sharon had waived the psychotherapist-patient privilege (Evid. Code, § 1014) by raising issues regarding the effect of Annette's alleged domestic violence against her. However, the court concluded that the trial court's discovery order was overbroad, and it directed the trial court to issue a new order limiting the scope of discovery. (*Sharon S. v. Superior Court* (Feb. 18, 2004, D037871) [nonpub. opn.].)

## C. *The Libel Action*

On November 17, 2001, after this court's *Sharon S.* decision had been filed but before it was final, Sharon wrote a letter to the board of directors of The Center, a gay and lesbian organization in San Diego, and sent a copy of the letter to the Gay and Lesbian Times of San Diego, which had published a cover story about this court's *Sharon S.* decision that contained extensive quotations from Annette's attorney. The letter was published in the December 6, 2001 edition of the Gay and Lesbian Times. In the letter, Sharon complained that a forum the Center had held on this court's *Sharon S.* decision had been one-sided. Sharon explained why she agreed with this court's initial ruling and expressed her support for Assembly Bill No. 25 (1983–1984 Reg. Sess.), a domestic partnership bill that provided for adoption rights. In the letter, Sharon also stated:

"Despite what the community seems to have been led to believe, I continue to support age-appropriate, regular contact between the children and Annette. Sometimes I question whether this is wise. *Annette, a convicted perpetrator of domestic violence against me, has made repeated false accusations of child abuse and neglect against me* while actively litigating for sole custody of both children, ages 5 and 2." (Italics added.)

In September 2002, Annette filed a libel action against Sharon. In her complaint, Annette alleged that the italicized language of Sharon's letter, above, was false and libelous on its face.

Sharon filed an answer to the complaint and a special motion to strike the complaint under the anti-SLAPP statute (strategic lawsuits against public participation). (§ 425.16.) The trial court denied the motion to strike. The court concluded that Sharon had met her initial burden of showing that the action arose from constitutionally protected speech. However, the court found that Annette had established a probability that she would prevail on her libel claim. (§ 425.16, subd. (b)(1).)

Sharon appeals from the trial court's order denying her special motion to strike. The order is appealable pursuant to sections 425.16, subdivision (j) and 904.1, subdivision (a)(13).

## II

## DISCUSSION

### A. *Burden of Proof and Standard of Review*

The anti-SLAPP statute was enacted in 1992 for the purpose of providing an efficient procedural mechanism for the early and inexpensive dismissal of nonmeritorious claims "arising from any act" of the defendant "in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1).) In order to achieve this objective, the Legislature authorized the filing of a special motion to strike such claims within 60 days after service of the complaint. (§ 425.16, subds. (b)(1), (f).)

Deciding an anti-SLAPP motion "requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].)

The trial court's determination of each step is subject to de novo review on appeal. (*Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456 [125 Cal.Rptr.2d 534]; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [113 Cal.Rptr.2d 625].)

### B. *The Complaint Arises from Protected Speech Activity Within the Scope of the Anti-SLAPP Statute*

Annette contends that the trial court erred in ruling that her libel action against Sharon is subject to a special motion to strike under the anti-SLAPP statute. (§ 425.16.) We disagree.

The anti-SLAPP statute applies only to a "cause of action . . . arising from" acts in furtherance of the defendant's constitutional right of petition or free speech in connection with a public issue. (§ 425.16, subd. (b)(1).) "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been

an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695] (*City of Cotati*).) "The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92 [124 Cal.Rptr.2d 530, 52 P.3d 703].)

■ A defendant may meet her burden of establishing that the complaint "arises from" protected activity by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e). (*City of Cotati, supra,* 29 Cal.4th at p. 78.) Section 425.16, subdivision (e) provides:

"As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

■ In determining whether a cause of action falls within the scope of subdivision (e), courts must broadly construe the anti-SLAPP statute. (§ 425.16, subd. (a).) Construing the statute broadly, we conclude that Annette's libel claim against Sharon arises from acts in furtherance of Sharon's constitutional right of free speech. (§ 425.16, subd. (b)(1).) Specifically, the libel action falls within the scope of subdivision (e) (2), (3), and (4).

1. *Sharon's Statements Were Made in Connection with an Issue Under Consideration or Review by a Judicial Body*

The libel action is based on allegations made by Sharon in connection with an issue under consideration by a judicial body. (§ 425.16, subd. (e)(2).) In her letter published in the Gay and Lesbian Times, Sharon expressed her views on this court's controversial *Sharon S.* decision. Annette's adoption

petition was pending in the superior court at the time, and the writ proceedings concerning the validity of second-parent adoptions were pending in the appellate courts. Sharon's allegations of domestic violence against Annette were directly at issue in the underlying adoption proceedings because Sharon claimed that her consent to Joshua's adoption had been obtained by fraud or undue influence arising from Annette's acts of domestic violence against her. Annette's allegations of abuse and neglect were also relevant to the parties' competing claims as to Joshua's best interests. Further, Sharon also raised a discovery issue relating to her allegation of domestic violence against Annette.

Because Annette's alleged domestic violence against Sharon and the allegations of abuse and neglect by Sharon were at issue in the pending adoption and writ proceedings, Sharon's statements in the Gay and Lesbian Times were "made in connection with an issue under consideration or review by a . . . judicial body . . . ." (§ 425.16, subd. (e)(2); see *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1048–1049 [61 Cal.Rptr.2d 58] [newspaper articles reporting on investigative audit were made in connection with issue under consideration in official proceeding]; *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 863 [44 Cal.Rptr.2d 46] [newspaper articles describing official hearings and court proceedings were made in connection with issue under consideration by judicial body].)

### 2. *Sharon's Statements Were Made in a Public Forum in Connection with an Issue of Public Interest*

Sharon's statements were also "made in a . . . public forum in connection with an issue of public interest." (§ 425.16, subd. (e)(3).) This court has concluded that a news publication is a "public forum" within the meaning of the anti-SLAPP statute if it is a vehicle for discussion of public issues and it is distributed to a large and interested community. (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 475–478 [102 Cal.Rptr.2d 205] [finding homeowners association newsletter to be a public forum].) By this definition, the Gay and Lesbian Times clearly qualifies as a "public forum." (But see *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1130–1131 & fn. 4 [2 Cal.Rptr.3d 385] [declining to follow *Damon*, applying the First Amendment definition of "public forum" used in connection with speech on public property, and concluding that most newspapers are not public forums].) Further, Sharon's letter was written "in connection" with an issue of public interest that potentially affected a large number of children and adoptive parents beyond the direct participants.

### 3. *Sharon's Statements Constitute Conduct in Furtherance of the Exercise of the Constitutional Right of Free Speech in Connection with an Issue of Public Interest*

■ Annette's complaint arises from conduct by Sharon "in furtherance of the exercise of the . . . constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) The *Sharon S.* litigation received widespread public attention because of its potential impact on those who had adopted children through second-parent adoptions, particularly in the gay and lesbian community. Commenting on a matter of public concern is a classic form of speech that lies at the heart of the First Amendment. (*Schenck v. Pro-Choice Network* (1997) 519 U.S. 357, 377 [137 L.Ed.2d 1, 117 S.Ct. 855].) Sharon had a constitutional right to speak out about the issues in the *Sharon S.* litigation, and in doing so, to explain the reasons for her decision to withdraw her consent to the adoption and to challenge its validity. Thus, Sharon's statements in the Gay and Lesbian Times were acts in furtherance of her constitutional right of free speech in connection with an issue of public interest. We conclude that Annette's complaint is within the scope of the anti-SLAPP statute.

### C. *Annette Failed To Establish A Probability Of Prevailing On Her Libel Claim*

■ Because Annette's libel action is within the scope of the anti-SLAPP statute, she bears the burden of demonstrating "a probability that [she] will prevail on the claim" in order to defeat Sharon's special motion to strike. (§ 425.16, subd. (b)(1).) In applying this prong of the anti-SLAPP statute to libel claims, courts must take into account whether the plaintiff is a public figure who must prove actual malice by clear and convincing evidence. (*Walker v. Kiousis* (2001) 93 Cal.App.4th 1432, 1445–1446 [114 Cal.Rptr.2d 69].)

■ We conclude that Annette is a limited purpose public figure who must prove actual malice by clear and convincing evidence in order to prevail on her libel claim. Annette has failed to establish a probability of meeting this burden with respect to Sharon's statement that Annette was a "convicted perpetrator of domestic violence." Further, Annette has failed to establish a probability of proving the falsehood of Sharon's statement that Annette "made repeated false accusations of child abuse and neglect" against her. Thus, we conclude that the trial court erred in denying the special motion to strike the complaint. .

## 1. *Annette Is a Limited Purpose Public Figure*

In *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710], the United States Supreme Court held that "public officials" may not prevail in an action for libel relating to their official conduct without proof that the allegedly false statement was made with "actual malice." Three years later, the court held that the same rule applies to private plaintiffs who are "public figures." (*Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975].)

In *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997] (*Gertz*), the court recognized two different categories of public figures. The first is the "all purpose" public figure who has "achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." The second is the "limited purpose" or "vortex" public figure who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." (*Id.* at. 351.) "Unlike the 'all purpose' public figure, the 'limited purpose' public figure loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy." (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 253–254 [208 Cal.Rptr. 137, 690 P.2d 610] (*Reader's Digest*).)

Annette clearly has not achieved such "pervasive fame or notoriety" as to be considered an "all purpose" public figure. (*Gertz, supra,* 418 U.S. at p. 351.) We must therefore decide whether Annette is a "limited purpose" public figure, and if so, for what limited purposes. "[S]uch a determination is often a close question which can only be resolved by considering the totality of the circumstances which comprise each individual controversy." (*Reader's Digest, supra,* 37 Cal.3d at p. 255; see generally Annot., Who is "Public Figure" For Purposes of Defamation Action (1994) 19 A.L.R.5th 1.)

"To characterize a plaintiff as a limited purpose public figure, the courts must first find that there was a public controversy." (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845 [52 Cal.Rptr.2d 831].) Not every private conflict that attracts widespread interest in the general public is considered to be a "public controversy" for this purpose. (*Time, Inc. v. Firestone* (1976) 424 U.S. 448, 454 [47 L.Ed.2d 154, 96 S.Ct. 958].) In *Firestone,* for example, the Supreme Court found that the ex-wife of "the scion of one of America's wealthier industrial families" (*id.* at p. 450) was not a limited purpose public figure, even though her divorce case was highly publicized and she held press conferences during the course of the divorce proceedings. (*Id.* at p. 454, fn. 3.) The court reasoned: "Dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz,* even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public." (*Id.* at p. 454.)

The United States Supreme Court has not specifically defined the meaning of a "public controversy." However, the Court of Appeals for the District of Columbia has defined the term to mean "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." (*Waldbaum v. Fairchild Publications, Inc.* (D.C. Cir. 1980) 627 F.2d 1287, 1296.) "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." (*Id.* at p. 1297.) The *Waldbaum* formulation of a public controversy has been followed in California. (*Copp v. Paxton, supra,* 45 Cal.App.4th at p. 845.) By this definition, this court's *Sharon S.* decision regarding the validity of second-parent adoptions was clearly a matter of public controversy at the time Sharon made her allegedly defamatory statements.

■ A "limited purpose public figure" must ordinarily "have undertaken some *voluntary* act through which he seeks to influence the resolution of the public issues involved." (*Reader's Digest, supra,* 37 Cal.3d at p. 254.) Public figures generally "invite attention and comment." (*Gertz, supra,* 418 U.S. at p. 345.) Although *Gertz* suggested that it is theoretically possible to become a public figure by being drawn into a particular "public controversy" without purposeful action (*id.* at pp. 345, 351), such a characterization is reserved "for an individual who, despite never having *voluntarily* engaged the public's attention in an attempt to influence the outcome of a public controversy, nonetheless has acquired such public prominence in relation to the controversy as to permit media access sufficient to effectively counter media-published defamatory statements." (*Khawar v. Globe Intern., Inc.* (1998) 19 Cal.4th 254, 265 [79 Cal.Rptr.2d 178, 965 P.2d 696].)

■ We conclude that Annette is a limited purpose public figure who has voluntarily invited attention and comment with respect to the issues involved in the *Sharon S.* litigation. Sharon and Annette deliberately solicited public attention and media coverage of their commitment ceremony in 1992. They set up a Web site to publicize the ceremony and to provide information to others about gay marriage and second-parent adoptions. Sharon and Annette willingly participated in a nationally televised show on gay marriage in 1996, in which they discussed Annette's efforts to establish a formal legal relationship with Zachary as an adoptive parent. According to Annette, she and Sharon participated in the show because they wanted to "put forth a positive image of a stable and loving lesbian relationship" and to provide "positive role models" for other gay people. The show received extensive coverage in the national press. Annette viewed herself and Sharon as "advocates for the civil rights of gay and lesbian people" and as "public figures." She considered their book to be "at the forefront of rights in the workplace."

Annette's involvement in the *Sharon S.* litigation brought her further recognition as a prominent lesbian whose case was portrayed by many as a battle for the legal rights of gay and lesbian parents. In the immediate aftermath of this court's initial decision, the case received a blizzard of attention in the media and widespread criticism in the gay and lesbian community. Annette and her attorneys were quoted in the press. Annette took advantage of the media attention by soliciting donations through a newly formed nonprofit organization to enable her to pursue the litigation. This organization also raised money for education, research, and analysis pertaining to second-parent adoptions.[4]

Annette's purposeful activities in drawing public attention to her relationship with Sharon in order to promote gay marriage and second-parent adoptions, and portraying the *Sharon S.* litigation as a battle to protect the rights of gay and lesbian parents and their children, made her a limited purpose public figure on the subject matter of the litigation. (Cf. *Curtis Publishing, supra,* 388 U.S. at pp. 140, 154–155 [individual who engaged in political activities in opposition to forced school desegregation became a public figure by "thrusting . . . his personality into the 'vortex' of an important public controversy"]; *Lohrenz v. Donnelly* (D.C. Cir. 2003) 350 F.3d 1272, 1279–1283 [female Navy pilot injected herself into public controversy over women in combat and became a limited purpose public figure by choosing to fly combat aircraft]; *Anti-Defamation League of B'Nai B'rith v. Superior Court* (1998) 67 Cal.App.4th 1072, 1089–1091 [79 Cal.Rptr.2d 597] [activists in Middle East and/or South African causes were limited purpose public figures]; *Copp v. Paxton, supra,* 45 Cal.App.4th at pp. 845–846 [earthquake safety expert who participated in public debate on earthquake disaster mitigation was a limited purpose public figure]; *Nadel v. Regents of University of California* (1994) 28 Cal.App.4th 1251, 1269 [34 Cal.Rptr.2d 188] [individuals who protested volleyball courts in People's Park and expressed their views in public and in the press were limited purpose public figures]; *Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1189–1191 [31 Cal.Rptr.2d 193] [individual who sought publication of two articles about a nature preserve made himself a limited purpose public figure]; *Denney v. Lawrence* (1994) 22 Cal.App.4th 927, 933–936 [27 Cal.Rptr.2d 556]

---

[4] The record indicates that this nonprofit organization was established sometime in 2001. The organization's Web site publicized forums about this court's *Sharon S.* decision that were scheduled to take place on November 11 and 18, 2001. We infer that the organization and its Web site were already operating when Sharon's letter was published in the Gay and Lesbian Times on December 6, 2001. Annette has submitted no contrary evidence.

[individual who gave press interviews about controversy surrounding his brother's arrest, conviction, and sentencing for killing wife was a limited purpose public figure].)

Annette argues that even if she is a limited purpose public figure, she need not prove actual malice because Sharon's allegedly defamatory statements did not relate to Annette's role in the public controversy over second-parent adoptions. (*Reader's Digest, supra,* 37 Cal.3d at pp. 253–254.) We disagree. As we have noted, Annette's alleged domestic violence against Sharon was at issue in both the adoption proceedings and the writ litigation. Sharon alleged that her consent to the second-parent adoption was procured by fraud and duress as a result of Annette's domestic violence. The allegations of domestic violence and abuse were also relevant to the parties' claims as to Joshua's best interests. Thus, the allegedly defamatory statements related directly to Annette's role as a limited purpose public figure in the controversy over second-parent adoptions. As a result, in order to prevail on her libel claim, she would have the burden of proving actual malice by clear and convincing evidence.

 2. *With Respect to Sharon's Statement that Annette Was a "Convicted Perpetrator of Domestic Violence," Annette Failed to Show a Probability of Establishing Actual Malice by Clear and Convincing Evidence*

Annette's complaint alleged that Sharon defamed her by stating that Annette was a "convicted perpetrator of domestic violence" against Sharon, because Annette has never been convicted of any crime. With respect to this claim, we conclude that Annette has failed to show a probability of proving by clear and convincing evidence that Sharon made the statement with "actual malice" within the meaning of *New York Times Co. v. Sullivan, supra,* 376 U.S. at pages 279–280.

 In order to establish a probability of prevailing in the context of an anti-SLAPP motion, the plaintiff must state and substantiate a legally sufficient claim. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123 [81 Cal.Rptr.2d 471, 969 P.2d 564].) "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citation.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].)

 Courts must take into consideration the applicable burden of proof in determining whether the plaintiff has established a probability of prevailing.

(*Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 274 [105 Cal.Rptr.2d 674].) A public figure suing for libel must therefore establish a probability that she will be able to produce clear and convincing evidence of actual malice. (*Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551, 1557 [1 Cal.Rptr.3d 245]; *Conroy v. Spitzer* (1999) 70 Cal.App.4th 1446, 1454 [83 Cal.Rptr.2d 443]; *Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 953 [52 Cal.Rptr.2d 357].) "The clear and convincing standard requires that the evidence be such as to command the unhesitating assent of every reasonable mind. [Citation.]" (*Beilenson v. Superior Court, supra,* 44 Cal.App.4th at p. 950.)

 The actual malice standard of *New York Times v. Sullivan, supra,* 376 U.S. 254, requires a showing that the allegedly false statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." (*Id.* at pp. 279–280.) The reckless disregard standard requires a "high degree of awareness of . . . probable falsity . . . ." (*Garrison v. Louisiana* (1964) 379 U.S. 64, 74 [13 L.Ed.2d 125, 85 S.Ct. 209].) "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." (*St. Amant v. Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 88 S.Ct. 1323].) Gross or even extreme negligence will not suffice to establish actual malice; the defendant must have made the statement with knowledge that the statement was false or with "actual doubt concerning the truth of the publication." (*Reader's Digest, supra,* 37 Cal.3d at p. 259, fn. 11.)

 The existence of actual malice turns on the defendant's subjective belief as to the truthfulness of the allegedly false statement. (*Reader's Digest, supra,* 37 Cal.3d at p. 257.) Actual malice may be proved by direct or circumstantial evidence. Factors such as failure to investigate, anger and hostility, and reliance on sources known to be unreliable or biased "may in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Id.* at pp. 257–258.) However, any one of these factors, standing alone, may be insufficient to prove actual malice or even raise a triable issue of fact. (*Id.* at p. 258.)

Sharon's statement that Annette was a "convicted perpetrator of domestic violence" could be interpreted to imply that Annette had been convicted of a crime. (Cf. *Boyich v. Howell* (1963) 221 Cal.App.2d 801, 802 [34 Cal.Rptr. 794] [circular alleging that councilman had been "convicted, fined and barred from holding a union office for five years" for ballot box stuffing could be viewed "as asserting conviction of crime" when viewed in context of other statements in the circular].) However, the dictionary meaning of the word

"convict" does not necessarily connote a finding of guilt of a crime; it can also mean "to show or prove to be guilty of something blamable (as wrong or error)." (Webster's 3d New Internat. Dict. (2002) p. 499, col. 3.)

 Even assuming that Sharon's statement could be construed as being false, however, this does not establish that she acted with actual malice. The actual malice standard of *New York Times Co. v. Sullivan* is based on a recognition that "erroneous statement is inevitable in free debate" and "must be protected" to give freedom of expression the "breathing space" it needs to survive. (*New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 271–272.) Accordingly, the Supreme Court has chosen to "protect some falsehood in order to protect speech that matters." (*Gertz, supra,* 418 U.S. at p. 341.)

According to Sharon, her use of the phrase "convicted perpetrator of domestic abuse" was meant to refer to the family court's finding that Annette had committed domestic violence against her.[5] In her sworn declarations in support of the anti-SLAPP motion, Sharon explained that she was not a lawyer and she did not consult with a lawyer before writing the letter that was published in the Gay and Lesbian Times. She further explained:

"My understanding of the legal proceedings involving Annette's domestic violence against me at the time I wrote my letter published by the *Times* as a 'Letter to the Editor' was that Annette had admitted, and the court found, that she committed physical domestic violence against me in front of my children, and that the court issued a full three year domestic violence permanent restraining order after two hearings to stop her from committing further physical violence against me. Therefore, [at] the time I wrote my letter, I stated what I believed to be true, i.e., that she was a convicted perpetrator of domestic violence against me."

Sharon's use of the word "convicted" to refer to a noncriminal adjudication is a fairly common use of the term. As Sharon points out in her opening brief, laypersons not trained in the law commonly use the word "convicted" to refer to civil findings. By way of example, Sharon cites newspaper articles reporting that O.J. Simpson was "convicted" of wrongful death in the civil

---

[5] The appellate record does not include a reporter's transcript of the December 2000 hearing on Sharon's request for a restraining order. However, Sharon's declarations state that the court held an evidentiary hearing and made a finding that Annette had committed domestic violence against her. Annette has submitted no contrary evidence. The purpose of the Domestic Violence Protection Act is to "prevent the *recurrence* of acts of violence and sexual abuse . . . ." (Fam. Code, § 6220, italics added.) Accordingly, a restraining order may not be issued unless there is evidence that "shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (Fam. Code, § 6300.)

trial against him. Even appellate courts are not immune to this loose usage of the term. (See, e.g., *West v. Matteson-Southwest Co., Ltd.* (Tex.App. 1963) 369 S.W.2d 496, 502 ["convicted of a breach of the contract"]; *Williams v. Colquett* (1961) 272 Ala. 577 [133 So.2d 364, 370] ["convicted tort-feasor"]; *Bonner v. Otto* (1926) 31 N.M. 395 [246 P. 902, 903] ["convicted of a breach of the contract"]; *Ward v. Barnes* (1894) 95 Ga. 103 [22 S.E. 133, 134] ["convicted either of the tort or breach of contract . . . ."].) Thus, Sharon's explanation that she innocently used the term "convicted" to refer to a noncriminal adjudication of domestic violence by the family court is not so implausible as to support an inference of actual malice.

 Annette introduced no evidence in the trial court to contradict Sharon's declaration as to her belief in the truthfulness of this allegedly defamatory statement. Although Sharon's profession of good faith is not necessarily determinative (*St. Amant v. Thompson, supra,* 390 U.S. at p. 732), Annette bore the burden of making a "sufficient prima facie showing of facts to sustain a favorable judgment" on the issue of actual malice. (*Wilson v. Parker, Covert & Chidester, supra,* 28 Cal.4th at p. 821.)

Annette contends that the following facts are sufficient to establish a prima facie showing of constitutional malice: (1) Sharon felt extreme anger and hostility toward Annette; (2) Sharon was "stung by the negative reaction" to this court's *Sharon S.* decision in the gay and lesbian community and was "overwhelmed by the desire to salvage her own reputation at the expense of Annette's"; and (3) Sharon's allegedly defamatory statement "was not uttered in the heat of argument" and "she had ample opportunity to check the accuracy" of the statement.

 None of these facts, individually or in combination, suffice to establish a probability of proving actual malice by clear and convincing evidence. Actual malice may not be inferred solely from evidence of personal spite, ill will, or bad motive. (*Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 666–667 & fn. 7 [105 L.Ed.2d 562, 109 S.Ct. 2678].) Similarly, mere failure to investigate the truthfulness of a statement, even when a reasonably prudent person would have done so, is insufficient. (*Id.* at p. 688.) Although these factors may provide circumstantial evidence of actual malice in appropriate cases, their significance will vary depending on the extent to which they reflect on the defendant's subjective state of mind. (*Reader's Digest, supra,* 37 Cal.3d at p. 258.)

 On the particular facts of this case, the factors cited by Annette do not establish a probability of proving actual malice by clear and convincing evidence. In our view, a critical consideration in determining the

weight to be given such factors is the extent to which the allegedly defamatory statement deviates from the truth. False statements that are completely "fabricated by the defendant" or "so inherently improbable that only a reckless man would have put them in circulation" are particularly likely to have been made with actual malice. (*St. Amant v. Thompson, supra,* 390 U.S. at p. 732; see also *Walker v. Kiousis, supra,* 93 Cal.App.4th at p. 1446 [finding sufficient circumstantial evidence of actual malice where defendant's "allegations were patently at odds with the actual events"].)

 On the other hand, false statements that have some element of truth to them are logically less susceptible to such a finding. In this case, it is undisputed that Annette admitted that she had hit Sharon, that she was found by the family court to have committed domestic violence, and that she was the subject of a restraining order. In these circumstances, Sharon's statement that Annette was a "convicted perpetrator of domestic violence" was not so far from the truth as to permit an inference of actual malice by clear and convincing evidence, even considering the additional evidence of hostility, alleged motive, and lack of investigation. At the most, these additional factors raised a speculative possibility that Sharon might have known or suspected that her use of the word "convicted" was technically incorrect. "Such a speculative possibility falls short of clear and convincing evidence." (*Copp v. Paxton, supra,* 45 Cal.App.4th at p. 847.) Thus, we conclude that Annette has failed to establish a probability of proving actual malice by clear and convincing evidence.

 3. *With Respect to Sharon's Statement that Annette Had "Made Repeated False Accusations of Child Abuse and Neglect," Annette Failed to Show a Probability of Establishing Falsehood by Clear and Convincing Evidence*

 Annette's complaint also alleged that Sharon defamed her by stating that Annette had "made repeated false accusations of child abuse and neglect" against Sharon. With respect to this claim, we conclude that Annette has failed to show a probability of proving falsehood by clear and convincing evidence. (See *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042 [232 Cal.Rptr. 542, 728 P.2d 1177] [plaintiff in case governed by *New York Times Co. v. Sullivan, supra,* 376 U.S. 254 bears burden of proving falsehood by clear and convincing evidence].)

The record establishes that Annette did in fact make allegations of child abuse and neglect against Sharon. According to a report by Joshua's attorney, Annette made "allegations" that Joshua had developed "self-mutilating" behaviors, and told Joshua's attorney that she believed Joshua was being "bothered/struck by Zachary on a frequent basis" in Sharon's home. Annette

attributed the boys' behavior to the fact that "Zachary may not have been adequately supervised in [Sharon's] home in part because [Sharon] was allegedly absent from her home for extended periods." Annette made it clear that she was basing her allegation of lack of supervision on statements allegedly made to her by Sharon's nanny, Ona Valdez.

Annette acknowledged having made these accusations in a sworn declaration filed in December 2001. Annette stated in her declaration that Joshua had shown up at her house with "deep gouges on his nose and a blackened eye" and that Zachary often came to her house "with bite marks from Joshua on his back, chest, arms or legs." According to Annette, both Joshua and Valdez told her that Sharon "did nothing to stop the behavior." Annette brought these matters to the attention of Joshua's attorney, his pediatrician, and his psychologist.

There is no other competent evidence in the record to support these allegations by Annette. Joshua's attorney conducted an investigation of the allegations and concluded that they were unfounded. He had Joshua examined by his pediatrician, who found no injuries or self-mutilating behaviors. He also spoke to Sharon and Valdez, who told him that the boys were properly supervised in Sharon's home. According to Joshua's attorney, neither Joshua's psychologist nor his preschool had made any reports of self-mutilating behavior. Joshua's attorney concluded that there was normal sibling conflict between Joshua and Zachary, there was adequate supervision of the children at Sharon's home, and there was no evidence of self-mutilating behavior or abuse of either child.

In these proceedings, Annette has failed to introduce any competent evidence to contradict the findings of Joshua's attorney or to substantiate her allegations of abuse or lack of supervision in Sharon's home. Her declarations in opposition to the anti-SLAPP motion make no reference to these allegations. She has offered no evidence from Joshua's pediatrician, psychologist, or nanny to support the allegations of physical injury, sibling abuse, self-mutilating behavior, or lack of supervision. Accordingly, we conclude that Annette has failed to show a probability of proving by clear and convincing evidence the falsehood of Sharon's statement that Annette had "made repeated false accusations of child abuse and neglect" against Sharon.

## III

## CONCLUSION

Annette's libel claim against Sharon arises from protected speech activity within the scope of the anti-SLAPP statute. (§ 425.16.) Annette has failed to

establish a probability of prevailing on her libel claim because: (1) she is a limited purpose public figure with respect to the issues involved in the *Sharon S.* litigation; (2) she must establish actual malice by clear and convincing evidence to prevail on her claim against Sharon; (3) she failed to show a probability of proving actual malice by clear and convincing evidence with respect to Sharon's statement that Annette was a "convicted perpetrator of domestic violence"; and (4) she failed to show a probability of proving falsehood by clear and convincing evidence with respect to Sharon's statement that Annette had "made repeated false accusations of child abuse and neglect." Accordingly, we conclude that the trial court erred in denying Sharon's special motion to strike pursuant to the anti-SLAPP statute.

## IV

## DISPOSITION

The trial court's order denying Sharon's anti-SLAPP motion is reversed. The matter is remanded with directions to grant the motion and enter judgment in Sharon's favor. Sharon is awarded costs on appeal.

Haller, Acting P. J., and McDonald, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 13, 2004.